IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TODD KURTZHALS,

                              Plaintiff,

v.

COUNTY OF DUNN,

                              Defendant.

OPINION and ORDER

18-cv-247-jdp

---

      Plaintiff Todd Kurtzhals was a sergeant with the Dunn County sheriff's department. In 2016, Kurtzhals had an argument with a subordinate deputy in which Kurtzhals threatened to settle the matter with violence. The sheriff, Dennis Smith, placed Kurtzhals on paid administrative leave while the matter was investigated, and he required Kurtzhals to undergo a fitness-for-duty exam before he returned to work. Kurtzhals passed the exam and returned to work after about three months. Kurtzhals voluntarily left employment with the sheriff's department in 2019.

      Kurtzhals now alleges that Dunn County (his employer and the defendant here) violated his rights under the Americans with Disabilities Act (ADA). Kurtzhals contends that the County discriminated against him because of his post-traumatic stress disorder (PTSD) and that the fitness-for-duty exam was unnecessary, and thus a violation of the ADA. The County moves for summary judgment. Dkt. 15. Kurtzhals' PTSD does not shield him from the consequences of his workplace conduct. No reasonable jury could find that the County placed Kurtzhals on leave because of his PTSD rather than because of his conduct. Likewise, Sheriff Smith reasonably believed, based on objective evidence, that the fitness-for-duty examination was warranted. The court will grant the County's motion and dismiss the case.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

**A. Kurtzhals's employment and military service**

Kurtzhals worked for the Dunn County Sheriff's Department from 1993 until his voluntary departure in January 2019. He was hired as a patrol deputy and was promoted to patrol sergeant in 1996. He worked as a patrol sergeant until 2002, when he was mobilized by the United States Army. He remained mobilized until 2014 and was deployed overseas twice, once to Kuwait and Iraq, and once to Afghanistan. But he spent most of his twelve-year mobilization in the United States, so he was able to continue working for the Department some of that time.

Around 2012, Kurtzhals was diagnosed with PTSD. He received two weeks of inpatient counseling in 2013 with Marcelo Angel Rodriguez-Chevres, M.D. This counseling focused on Kurtzhals's marital difficulties, but Kurtzhals and his doctor often discussed his PTSD as well. He reported nightmares and flashbacks related to a near-death experience on an airplane in Iraq and to an on-the-job fatal shooting in Dunn County in 1998.

Kurtzhals was honorably discharged in June 2014 and returned to the Department as a full-time patrol sergeant shortly thereafter. At the time, the Department was led by Sheriff Dennis Smith, whose second-in-command was Chief Deputy Paul Gunness. Captain Kevin Bygd was Kurtzhals's direct supervisor.

Within a few days of his return, Kurtzhals told Gunness that he had been diagnosed with PTSD and that he had received counseling for that condition. Gunness replied that this wouldn't cause a problem. The two discussed Kurtzhals's PTSD at least five or six times over the next two years. Kurtzhals also says that he informed Bygd about his counseling and PTSD

diagnosis, but Bygd denies that. According to Kurtzhals, Gunness and Bygd each said they would tell Smith about his PTSD and counseling. But Gunness, Bygd, and Smith deny that any such conversations occurred, so whether Smith knew about Kurtzhals's PTSD is disputed.

**B. Kurtzhals's altercation with Dennis Rhead**

Gunness retired in March 2016, and Marshall Multhauf became chief deputy. Kurtzhals had been interested in the chief deputy position and he discussed being passed over for the promotion with Smith. Smith says that Kurtzhals became upset during their conversation; Kurtzhals says that both of them were upset and raised their voices.

Kurtzhals requested and received a reassignment as the sergeant of investigations. In this role, he supervised three investigators, including Dennis Rhead. Shortly after Kurtzhals's reassignment, some deputies discovered a safe along a road, but its recovery had been mishandled. Kurtzhals mistakenly believed that Rhead had been involved in the incident.

Rhead learned that Kurtzhals was upset with him about the safe and went to Kurtzhals's office to discuss the matter on the morning of April 1, 2016. The meeting turned into an angry confrontation. Kurtzhals and Rhead offered differing accounts of the incident: each of them blamed the other for escalating the discussion to an argument. But this much is undisputed: Rhead called Kurtzhals a liar; and Kurtzhals told Rhead that if he ever called Kurtzhals a liar again, they would have to settle the matter outside. Both Kurtzhals and Rhead reported that they had felt intimidated by the other.

Later that day, Smith investigated the incident, and he solicited statements from Department employees who overheard the altercation. The employees all stated that they heard Kurtzhals threaten to take Rhead to the parking lot, or to take him outside, to settle things. Dkt. 23-9; Dkt. 23-10; Dkt. 23-11; Dkt. 24-5.

3

### C. Kurtzhals's discipline

A few days after the altercation, Multhauf suggested to Smith that a psychological fitness-for-duty examination might be appropriate for Kurtzhals. The purpose of such an examination would be to determine whether Kurtzhals's state of mind might interfere with Kurtzhals performing his duties safely and consistently. Dkt. 24-9, at 3. The Department didn't have a formal policy about fitness-for-duty examinations. Since 2000, it had only required one other employee, a deputy, to undergo a fitness-for-duty examination. That deputy had threatened two coworkers, telling them that they should be looking over their shoulders because they wouldn't be safe at work. The Department had placed the deputy on paid administrative leave pending the examination.

Smith and Multhauf consulted with Dr. Thomas Campion, a psychologist who specialized in psychological examinations of law enforcement officers. Campion said he believed a fitness-for-duty examination would be appropriate. Smith and Multhauf also discussed the fitness-for-duty examination with county administrative officers, including corporation counsel, the county manager, and the human resources manager. All agreed that a fitness-for-duty examination was appropriate in Kurtzhals's case.

After these discussions, Smith decided to place Kurtzhals on paid administrative leave pending an investigation into whether his conduct violated the Workplace Violence Policy. That policy prohibited "[a]ll threats or acts of violence occurring on Dunn County property." Dkt. 24-4. Such "threats or acts of violence" included "[t]he suggestion[] or intimation that violence is appropriate." *Id.* At the time, Kurtzhals was out of the office for training, so they decided to put him on leave when he returned.

Smith also decided to require Kurtzhals to take a fitness-for-duty examination before returning to work. Bygd didn't participate in that decision. Smith says that he was concerned about "[a] safety issue" and the "well-being or the feeling of safety within the office." Dkt. 27 (Smith Dep. 87:3–5). Smith also says that Kurtzhals's angry reaction to being passed over for the chief deputy promotion also factored into his disciplinary decision.

Smith took no disciplinary action against Rhead. Smith says this was because he didn't believe that Kurtzhals genuinely felt threatened by Rhead and because he thought Rhead's description of the altercation was more accurate.

On April 13, 2016, Kurtzhals returned to the office from training. Smith and Multhauf gave Kurtzhals a letter notifying him that he would be placed on paid administrative leave "pending an investigation of a report of workplace violence and safety" and that he would have to undergo a fitness-for-duty examination with Campion on April 20. Dkt. 24-6. In response, Kurtzhals offered to take a polygraph test. He also says that he asked Smith and Multhauf whether the discipline had anything to do with military experience or his PTSD, but neither of them replied. Neither Smith nor Multhauf recalls Kurtzhals asking such a question.

About April 18, 2016, Smith received a letter from Kurtzhals's attorney, Peter Reinhardt, alleging that the difference in treatment between Kurtzhals and Rhead was illegal discrimination based on Kurtzhals's PTSD. The letter asked Smith to cancel Kurtzhals's scheduled fitness-for-duty examination and allow him to return to work. Smith cancelled the examination to obtain legal advice, but he kept Kurtzhals on administrative leave. Smith and Multhauf say that they first learned of Kurtzhals's PTSD diagnosis from this letter.

After Smith received the letter from Kurtzhals's attorney, the County retained Mindy Dale, an employment lawyer from a private law firm, to investigate the allegations against

Kurtzhals. Dale concluded that Kurtzhals's statement to Rhead about taking it to the parking lot was a violation of the Workplace Violence Policy. She said that "both Rhead and Kurtzhals [were] at fault for allowing the situation to escalate" and that "neither exhibited the professional demeanor towards each other that is expected in the workplace." Dkt. 43-5, at 2. She concluded that requiring a fitness-for-duty examination was an "over-reaction." Dkt. 43-5, at 2. She recommended that Smith discipline Kurtzhals with at least a written warning, but that Smith allow Kurtzhals to return to work without a fitness-for-duty examination.

Smith discussed Dale's recommendation with the county manager and corporation counsel, but they adhered to their prior decision to require a fitness-for-duty examination. Smith ordered Kurtzhals to undergo the examination by Campion on June 7, 2016. Kurtzhals did so, and Campion cleared Kurtzhals to return to work, which he did on July 8. He had been on leave for a total of two months and three weeks, during which the County paid his full salary plus 27 hours of overtime pay. He worked with the Department until he voluntarily resigned (for reasons unrelated to this incident) in January 2019.

The court has subject matter jurisdiction over Kurtzhals's claims under 28 U.S.C. § 1331 because they arise under federal law.

ANALYSIS

Kurtzhals asserts two claims under the ADA: (1) the County discriminated against him on the basis of a disability in violation of 42 U.S.C. § 12112(a) when it placed him on paid administrative leave; and (2) the Count required Kurtzhals to take a fitness-for-duty examination that wasn't "job-related and consistent with business necessity," in violation of 42 U.S.C. § 12112(d)(4)(A). Summary judgment on Kurtzhals's claims is appropriate if the

6

County "shows that there is no genuine dispute as to any material fact and the [County] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the County's motion for summary judgment, the court construes all facts and draws all reasonable inferences in Kurtzhals's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To avoid summary judgment, Kurtzhals "must produce sufficient admissible evidence, taken in the light most favorable to [him], to return a jury verdict in [his] favor." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012).

## A. ADA discrimination claim

The ADA prohibits workplace discrimination on the basis of disability. 42 U.S.C. § 12112(a). To prevail on his discrimination claim, Kurtzhals must prove four elements: (1) he is disabled; (2) he is qualified to perform the essential functions of the job with no more than reasonable accommodation; (3) he suffered an adverse job action; and (4) he wouldn't have suffered an adverse job action "but for" his disability. *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016).

The County contends that Kurtzhals cannot establish any of these elements. But Kurtzhals has made at least an arguable showing on the first three elements. So for purposes of this motion, the court will assume that Kurtzhals has adduced sufficient evidence to survive summary judgment on those elements. But Kurtzhals's claim falters on the fourth element, causation.

Kurtzhals's PTSD does not shield him from the consequences of his workplace behavior. An employer does not violate the ADA if it disciplines an employer for workplace conduct, even if his conduct was precipitated by a mental disability such as PTSD. *See Palmer v. Circuit Court of Cook Cty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997). So Kurtzhals must show that he was

7

disciplined because of his PTSD, and not because of his workplace misconduct. The court of appeals has interpreted the ADA to require "but-for" causation, which means that to prove his case, Kurtzhals must show that the County wouldn't have disciplined him but for his disability. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). Under the but-for standard, it is not enough to show that the employer's decision was the result of mixed motives, and that discrimination was merely one of the motivating factors.[1]

Under the Seventh Circuit's simplified approach to discrimination cases, at summary judgment the court reviews the evidence as a whole, focusing on the core question, which is whether the evidence would permit a reasonable jury to find that Kurtzhals would not have been placed on administrative leave but for his disability. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (applying *Ortiz* approach to ADA claims). But the court does not serve as a super-personnel department to second-guess employer policies or decisions. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). The critical question is not whether the adverse decision was fair or wise, but whether the proffered reason for it was a guise for discrimination. *Id*. The burden-shifting framework from *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), remains a useful way to present and assess discrimination evidence. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

---

[1] Kurtzhals points out that there is some question whether the ADA Amendments Act of 2008 changed the causation standard. *See Monroe,* 871 F.3d at 504. But Kurtzhals doesn't argue for a different standard, so the court will follow the approach taken in *Monroe* and apply the but-for causation standard.

1. **The decisionmakers' knowledge**

The County's first argument about causation is that the decisionmakers—Smith and Multhauf—did not know about Kurtzhals's PTSD until after they decided to place Kurtzhals on administrative leave, so they could not have been motivated by any intent to discriminate against Kurtzhals because of his PTSD. Both Smith and Multhauf testified that they learned about Kurtzhals's PTSD for the first time when they received the letter from Kurtzhals's lawyer on April 18, 2016. Kurtzhals testified that he told Gunness and Bygd about his PTSD diagnosis in 2014 but that he otherwise kept that information confidential. Bygd denies knowing about Kurtzhals's PTSD, and both Gunness and Bygd deny ever discussing Kurtzhals's PTSD with Smith. The only evidence that Kurtzhals adduces that relates to Smith's and Multhauf's knowledge is Kurtzhals's own testimony that both Gunness and Bygd told Kurtzhals that they would inform Smith about it. Kurtzhals's evidence is not strong, but the court does not weigh evidence at summary judgment. If the court credits Kurtzhals's testimony, as it must, it is a reasonable inference that Gunness and Bygd did what they said they would do, which was to tell Smith about Kurtzhals's PTSD. The court concludes that Kurtzhals has adduced enough evidence to support a finding that Smith knew about Kurtzhals's PTSD.

But that still leaves the question of whether Smith and Multhauf would have put Kurtzhals on administrative leave if not for Kurtzhals's PTSD. Kurtzhals's overarching argument is that the given reasons for his discipline were pretextual. He cites four categories of evidence to support this argument, and the court evaluates each category in turn.

2. **Pretextual explanations**

Kurtzhals says that Smith lied about why he disciplined Kurtzhals. Kurtzhals tries to cast doubt on Smith's statement that Kurtzhals's angry reaction to being passed over for

9

promotion factored into the decision to discipline Kurtzhals. Kurtzhals says that Smith would have documented that promotion conversation if he found it that disturbing. There are two problems with this point. First, by Kurtzhals's own admission, contentious workplace interactions were common in the Department, so the failure to document one would not be unusual. Dkt. 41, ¶¶ 65–66. Second, and more important, Smith's primary reason for disciplining Kurtzhals was the threatened violence in the Rhead incident, and Smith's comments about the promotion argument give no reason to doubt the sincerity of that reason.

Kurtzhals also says that Smith lied when he said he believed Rhead's version of the incident more than Kurtzhals's. Kurtzhals points to testimony (his own and Bygd's) that Rhead was a "pot stirrer" with a reputation of stretching the truth to cause trouble. Dkt. 28 (Kurtzhals Dep. 85:9–11) and Dkt. 35 (Bygd Dep. 28:4–5). And Kurtzhals says that if Smith actually believed Rhead, he wouldn't have bothered to hire Dale to investigate the incident, and he would have accepted Kurtzhals's offer to take a polygraph test. The main problem with this line of argument is that the material facts of the Rhead incident are not in genuine dispute. Kurtzhals concedes that he threatened to take Rhead out to the parking lot, whereas Rhead did not explicitly threaten Kurtzhals. Kurtzhals and Rhead dispute who escalated the meeting into an angry argument. But regardless of who started it, Smith accurately concluded that Kurtzhals was the one who threatened violence.

In sum, Kurtzhals has adduced no evidence to support his charge that Smith lied about his reasons for disciplining Kurtzhals.

### 3. Differential treatment of Rhead

Kurtzhals contends that Rhead was a similarly-situated employee who was treated more favorably following their altercation, which shows that Kurtzhals was disciplined because of his

10

PTSD. In determining whether two employees are similarly situated because of their misconduct, "the critical question is whether they have engaged in conduct of comparable seriousness." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). One indicator that the employees' conduct may be of comparable seriousness is that they violated the same work rule. *Id.*

Kurtzhals says he is similarly situated to Rhead because Rhead's conduct also violated the Workplace Violence Policy, but the County didn't investigate or discipline Rhead, suggesting that the material difference is that Rhead did not have PTSD. Kurtzhals says that Rhead violated the policy through his "intimidating" conduct during their altercation by "towering over Kurtzhals, shov[ing] his hand almost in Kurtzhals'[s] face and . . . yell[ing] at Kurtzhals," Dkt. 41, ¶ 45. But, again, there is no genuine dispute that Rhead did not suggest violence, but Kurtzhals did. To put it in terms of the policy, Kurtzhals "suggest[ed] or intimat[ed] that violence is appropriate," but Rhead didn't. Dkt. 24-4 (Workplace Violence Policy). Both Rhead and Kurtzhals may have engaged in inappropriate conduct, but Kurtzhals's misconduct was indisputably more serious. The two employees aren't similarly situated.

### 4. Dale's recommendation

Kurtzhals says that Smith's rejection of Dale's recommendation against requiring a fitness-for-duty examination is further circumstantial evidence that Smith's true motivation was discrimination based on Kurtzhals's PTSD. Dale's recommendation is evidence that another decisionmaker might have made a different decision. But Kurtzhals adduces no evidence that Smith's failure to follow Dale's recommendation was outside the bounds of reasonableness. To the contrary, Smith's decision to require the fitness-for-duty examination was endorsed by the county manager and the corporation counsel, as well as by the psychologist

Campion. Dale's recommendation against the fitness-for-duty examination was the minority view. Smith's decision not to follow it raises no inference of discrimination.

	5. **Smith and Multhauf's response to Kurtzhals**

Kurtzhals testified that when he was placed on administrative leave, he discussed his military service with Smith and Multhauf. He then directly asked Smith and Multhauf whether his discipline was related to his military service, his counselling, or his PTSD, and they simply didn't answer. (Smith and Multhauf deny that Kurtzhals asked this question.) Kurtzhals argues that if his discipline was not related to his PTSD, they would have said so. So, he argues, their silence implies that Smith and Multhauf had knowingly disciplined Kurtzhals for his PTSD. But even crediting Kurtzhals's version of the facts, Smith's and Multhauf's silence in the face Kurtzhals's implicitly accusatory question does not support an inference that they knew about Kurtzhals's PTSD and disciplined him for it.

Viewing the evidence as a whole, Kurtzhals has not adduced evidence sufficient to support a reasonable jury verdict in his favor. Smith had evidence that Kurtzhals had violated the Workplace Violence Policy, and he placed Kurtzhals on paid administrative leave while the matter was investigated. Smith conducted a reasonable and thorough investigation, solicited informed advice, and decided that Kurtzhals had violated the policy. No reasonable jury could conclude that Kurtzhals's PTSD, and not his workplace misconduct, was the but-for cause of his discipline.

**B. Medical examination claim**

In addition to prohibiting workplace discrimination on the basis of disability, the ADA also prohibits employers from requiring employees to undergo medical examinations that aren't "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). This

12

provision applies to all employees, not just to those who have a qualifying disability. *Wright v. Ill. Dep't of Children and Family Servs.*, 798 F.3d 513, 522 (7th Cir. 2015). Kurtzhals contends that the County violated this provision by requiring him to take a fitness-for-duty examination before returning to work.

Under § 12112(d)(4)(A), the employer has the burden to show that it had a "reasonable belief based on objective evidence . . . that the employee [would] pose a threat due to a medical condition." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (citing EEOC enforcement guidelines). Examination of an employee's mental health may be allowed to protect the safety of employees and the public at large, particularly in public safety occupations. *Id*.

The County contends that Smith had a reasonable belief that Kurtzhals posed a safety threat. The County cites, as objective evidence, Kurtzhals's threat toward Rhead and his earlier heated argument with Smith over the chief deputy promotion. Kurtzhals offers several arguments why a fitness-for-duty examination was not reasonable. Some of these reasons are the same ones made in support of his discrimination claim, and they have already been addressed above. So the court addresses these reasons only briefly here.

Dale's opinion that a fitness-for-duty was unnecessary was an outlier; Smith consulted with the psychologist, the county manager, and the corporation counsel who all agreed that a fitness for duty examination was needed. The county does not have to show that the need for the exam was beyond reasonable dispute.

Rhead was not required to submit to a fitness-for-duty examination before returning to work. But this does not show that Smith's belief that Kurtzhals should submit to the exam was unreasonable. Kurtzhals threatened violence; Rhead did not.

Smith's statement that the argument with Kurtzhals about the chief deputy promotion contributed to his decision to require the fitness-for-duty exam does not undermine the reasonableness of the decision. Nor does Smith and Multhauf's alleged silence in response to Kurtzhals's question about whether his discipline was related to his PTSD.

The court turns now to the main arguments that Kurtzhals makes specifically about the fitness-for-duty exam.

### 1. The Department's history with fitness-for-duty examinations

Kurtzhals says that the Department's lack of a policy regarding fitness-for-duty examinations and its past use (or lack of use) of such examinations undermines the reasonableness of Smith's belief that an examination was necessary. An employer's "standard practice" regarding medical examinations and its "differential application of a medical examination requirement" are "certainly relevant evidence of what is 'necessary.'" *Wright*, 798 F.3d at 524 (quoting *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001)).

Since 2000, the Department had required only one other deputy to take a fitness-for-duty examination. That deputy had verbally threatened his coworkers, saying that they should be looking over their shoulders and that they wouldn't be safe at work. Kurtzhals argues that his threat to take Rhead out to the parking lot was less threatening than the previous deputy's threat. But this is, at most, a minor difference of degree. This example does not help Kurtzhals because it does not show the Department has ever let an employee return to work after making a threat of physical violence without a fitness-for-duty examination.

Kurtzhals cites some other examples of employees who faced serious allegations of misconduct and yet did not undergo fitness-for-duty examinations. For example, one deputy was accused of sexual assaulting fellow employees. That deputy was placed on paid

14

administrative leave, but he resigned a month or two later, so he never faced a fitness-for-duty exam. Dkt. 35 (Bygd Dep. 76:12–24). But Kurtzhals cites no example of a Department employee who was found to have committed or threatened violence and yet returned to work without a fitness-for-duty examination.

### 2. Conditions of Kurtzhals's leave

Kurtzhals argues that the conditions under which he was placed on leave show that Smith did not really believe that he posed a safety threat: he wasn't placed on leave until 12 days after his altercation with Rhead; he wasn't prohibited from entering the office while on leave; and he wasn't required to turn in his gun. The County could have taken more aggressive action against Kurtzhals if Smith believed that Kurtzhals posed a more acute threat. But the decision to forbear from more aggressive action does not mean that the steps taken were not necessary.

The County has adequately explained why it did not take more aggressive steps. The 12-day delay was because Smith was gathering information and because of Kurtzhals's two-week absence from the office for an out-of-town training session. When Kurtzhals unexpectedly came into the office during that period, Smith and Multhauf immediately placed him on paid administrative leave. Smith testified that not barring Kurtzhals from the office entirely during his leave was an oversight. And Multhauf has testified that he didn't think it was necessary to take Kurtzhals's gun because he saw Kurtzhals as "more of a situational threat." Dkt. 26 (Multhauf Dep. 86:20–21). Kurtzhals hasn't adduced evidence to dispute Smith and Multhauf's testimony or to suggest that the actions of Smith and Multhauf were inconsistent with a belief that Kurtzhals posed a real safety risk, albeit one that did not create an immediate crisis.

The County has met its burden to show that Smith reasonably believed, based on objective evidence, that requiring Kurtzhals to take a fitness-for-duty examination was job-related and consistent with business necessity.

CONCLUSION

Kurtzhals hasn't adduced evidence to show that he was disciplined because of his PTSD rather than his own workplace conduct. And the County has shown that Smith reasonably believed that requiring Kurtzhals to take a fitness-for-duty examination was a job-related business necessity. The court will grant the County's motion for summary judgment.

ORDER

IT IS ORDERED that:

1. Defendant County of Dunn's motion for summary judgment, Dkt. 15, is GRANTED.

2. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered September 25, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge